**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**PADUCAH DIVISION**

| | |
|---|---|
| **MAYFIELD CONSUMER PRODUCTS, LLC** | **PLAINTIFF** |
| **v.** | **No. 5:23-cv-101-BJB** |
| **THE INTERNATIONAL GROUP, INC., ET AL.** | **DEFENDANTS** |

**-----**

| | |
|---|---|
| **THE INTERNATIONAL GROUP, INC.** | **THIRD-PARTY PLAINTIFF** |
| **v.** | |
| **NATIONAL TANK SERVICES, ET AL.** | **THIRD-PARTY DEFENDANTS** |

*** * * * ***

**OPINION REGARDING GRANT OF MOTION TO DISMISS AND ORDER GRANTING MOTION TO CERTIFY**

In response to three Defendants' motions to dismiss for lack of personal jurisdiction, the Court held a hearing and granted the motions orally. Then the Plaintiff, Mayfield Consumer Products, filed a motion to certify that order as final and appealable under Rule 54(b). Motion to Certify (DN 127) at 2. To the extent MCP implicitly seeks reconsideration of the prior jurisdictional ruling, the Court denies that request. But because dismissal on jurisdictional grounds marks the conclusion of the discrete portion of this dispute involving those three Defendants, the Court grants the request to designate that otherwise interlocutory order as final under Rule 54(b).

### A. Factual Record

Mayfield Consumer Products operates a "candle manufacturing business in Graves County, Kentucky." Amended Complaint (DN 34) at ¶ 3. In July 2022, MCP purchased nearly 42,000 gallons of wax from the International Group to make wax candles. ¶ 15. According to MCP's Amended Complaint, which the Court accepts as true (at least with respect to its non-jurisdictional allegations), the wax arrived contaminated—which it discovered only after candles failed ordinary "burn testing." ¶¶ 39–42. During testing, they were "burning too high, burning too hot, and flashing

over, resulting in a scorched or melted label." ¶ 39. This prompted MCP to investigate the cause of the defective candles. The investigation revealed that the tank that shipped the wax had previously contained a silicone elastomer product called "Xiameter." ¶ 27. "Trace quantities" of Xiameter were left in the tank even after it was washed, which "severely impact[ed]" the "burn characteristics" and "safety" of the candles. ¶ 29.

The carrier that shipped the contaminated wax was a Canadian company called Contrans Tank Group. ¶¶ 5–6, 17. The International Group contracted with Contrans to transport the wax from International Group's Toronto facility to the Kentucky candle company. ¶ 17. Before Contrans shipped the wax, it contracted with another Canadian company—Trimac Transportation Services, Inc. (TTSI)—"to clean and inspect [the] tankwagon that would be used to transport" the wax to Kentucky. ¶ 21. That washing facility was located in Canada. After it cleaned Contrans' tankard, TTSI generated an (allegedly incorrect) "cleaning certificate." ¶ 26; Certificate (DN 34-2). That certificate identified ethylene glycol as the last cargo contained in the washed tank. Further investigation, however, showed that the tank had actually contained Xiameter, the chemical that MCP alleges contaminated the candles. ¶¶ 41–42; Corrected Certificate (DN 34-3).

MCP claims the contamination resulted in more than $9,700,000 in damages because it had "to destroy" the ruined candles, "shut down Silo 6," and "remediate the contamination in its Kentucky facility." ¶ 46.

**B. Procedural History**

MCP's initial complaint (DN 1) sued only the wax supplier, the International Group. MCP is a limited liability company and citizen of Wyoming, Am. Compl. at ¶ 2, while the International Group "is a citizen of Delaware and Pennsylvania for jurisdictional purposes," ¶ 4. But the International Group shipped the wax from its manufacturing plant in Toronto, Canada, to MCP's factory in Kentucky. ¶ 17. No one has objected to the Court's exercise of subject-matter and personal jurisdiction with respect to these diverse parties or any claims between them.

MCP later amended its complaint (with the International Group's consent) to add claims against the tank carrier, Contrans, and the tank washer, TTSI. According to the Amended Complaint, TTSI operates in tandem with two American corporations, which it sued as well: Trimac Transportation, Inc. (TTI) and Trimac Transportation Services Western, Inc. (TTSWI). Am. Compl. ¶ 10; MCP Response to TTSI Motion to Dismiss (DN 107) at 3–5. All three entities, according to MCP, "do business under the brand name of National Tank Services ('NTS')," which the amended complaint refers to throughout. Am. Compl. ¶ 10. The International Group followed suit by filing its own third-party complaint against Contrans and the three Trimac defendants. DN 36.

Contrans moved to dismiss only one part of MCP's amended complaint—the demand for punitive damages—on the ground that MCP plausibly pleads only negligence, which is insufficient to support punitives under Kentucky law. *See* Partial Motion to Dismiss (DN 54) at 6–10. The Court granted that motion without prejudice. *See* DN 82; Hearing Transcript (DN 125) at 8:18–9:5.

The three Trimac Defendants, meanwhile, moved to dismiss all claims in the amended complaint (DN 72, DN 82) and third-party complaint (DN 74, DN 82) for lack of personal jurisdiction under FED. R. CIV. P. 12(b)(2). Before responding to the motions, MCP and the International Group requested a stay in briefing and limited jurisdictional discovery, *see* DNs 83, 90, 91, which the Magistrate Judge granted, DN 100. *See Theunissen v. Matthews*, 935 F.2d 1454, 1465 (6th Cir. 1991) (A "district court faced with a motion to dismiss for lack of personal jurisdiction … may permit the plaintiff further discovery to investigate jurisdictional facts[.]"). The parties proceeded to conduct depositions and exchange written discovery responses. *See, e.g.,* MCP's Exhibit Index (DN 106) (attaching declarations, deposition excerpts, email exhibits, and interrogatory responses).

Following the jurisdictional discovery and resumed briefing, the Court held a hearing regarding the motions to dismiss. *See* Hearing Order (DN 118). For the reasons stated on the record at the hearing, and as explained more fully below, the Court granted the Trimac Defendants' motions to dismiss for lack of personal jurisdiction.

**C. Due Process and Personal Jurisdiction**

A federal court sitting in diversity "may exercise personal jurisdiction over an out-of-state defendant only if a court of the forum state could do so." *Aristech Chem International Ltd. v. Acrylic Fabricators Ltd.*, 138 F.3d 624, 627 (6th Cir. 1998). Until 2024, Kentucky courts utilized a two-step analysis for personal jurisdiction: first apply the state's long-arm statute, then federal due-process standards. *Hinners v. Robey*, 336 S.W.3d 891, 895 (Ky. 2011); *see* K.R.S. § 454.210(2)(a). But the statute has since been amended to eliminate the first step, conferring jurisdiction over "any activity so long as the assertion of personal jurisdiction would comport with due process and other constitutional requirements." *Braun v. Bearman Industries*, 740 S.W.3d 300, 305 n.3 (Ky. 2025).[1] The parties disputed which version would apply

---

[1] In other words, the analysis under the amended state long-arm statute is now "coextensive" with the constitutional due-process analysis. *Premier Packaging, LLC v. Sticky Fingers Sweets & Eats, Inc.*, No. 3:24-cv-427, 2025 WL 359324, at *3 (W.D. Ky. Jan. 31, 2025). The previous version of the statute, however, "require[d] an independent analysis, separate and distinct from the due process inquiry." *Woods v. Morris Mohawk Gaming Grp.*, No. 3:23-cv-53, 2025 WL 3459479, at *2 (E.D. Ky. Dec. 2, 2025).

here, since the factual basis for the lawsuit preceded the Kentucky General Assembly's amendment of the statute in 2024.

Under either version of the statute, however, this court's exercise of personal jurisdiction must comport with the federal due-process clause. And because it doesn't, dismissal on that basis eliminates any need to resolve which version of the Kentucky long-arm statute applies.

The Due Process Clause "protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (citation omitted). Where (as here) the defendants are not "essentially at home" in the forum state,[2] a court must proceed only if it has "[s]pecific jurisdiction" over those defendants—a form of personal jurisdiction that applies "to a narrower class of claims." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358–59 (2021).

Three questions must be answered for a federal court to exercise specific jurisdiction:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Air Products & Controls v. Safetech International*, 503 F.3d 544, 550 (6th Cir. 2007) (quoting *Southern Machine Co. v. Mohasco Industries*, 401 F.2d 374, 381 (6th Cir. 1968)). The plaintiff bears the burden of offering "specific facts" to prove specific jurisdiction over each defendant. *Conn v. Zakharov*, 667 F.3d 705, 711 (6th Cir. 2012). If, as here, "the district court allows discovery on the motion, the court should consider the facts offered by both parties and rule according to the preponderance of the evidence." *SFS Check, LLC v. First Bank of Delaware*, 774 F.3d 351, 356 (6th Cir. 2014) (citing *Serras v. First Tennessee Bank National Association*, 875 F.2d 1212, 1214 (6th Cir. 1989)).[3]

---

[2] No one contends that "general jurisdiction" applies to TTSI, which is based in Canada and plainly are not "essentially at home" in Kentucky. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358–60 (2021).

[3] Complicating matters somewhat here, the parties engaged in jurisdictional discovery but did not request an evidentiary hearing—at least not one in which the Court found facts and heard testimony. Instead, the remote hearing regarding these motions addressed the

### *1. Personal Jurisdiction Over TTSI*

The appropriateness of the claims against TTSI depends on the first prong of the Due Process analysis: whether this Canadian entity purposefully availed itself "of the privilege of acting in … or causing a consequence in" Kentucky. *Air Products*, 503 F.3d at 551 (citation omitted). Simply washing a tank that eventually made its way to Kentucky, TTSI argued, didn't intentionally take advantage of (or even contemplate) the availability of Kentucky's jurisdiction. TTSI Motion to Dismiss Third-Party Complaint (DN 74) at 12. TTSI is correct: MCP and International Group have not shown that TTSI "purposefully availed" itself of Kentucky as would be required for personal jurisdiction in this case. *Air Products*, 503 F.3d at 551.

"[P]urposeful availment is something akin to a deliberate undertaking to do or cause an act or thing to be done in" the forum state. *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 891 (6th Cir. 2002) (citation omitted). This "requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous' or 'attenuated' contacts." *Air Products*, 503 F.3d at 551 (citation omitted). Here, the parties agree that TTSI never had "physical contacts with the forum state." *Bridgeport Music, Inc. v. Still N The Water Pub.*, 327 F.3d 472, 479 (6th Cir. 2003).

So this Court had personal jurisdiction over TTSI only if MCP and International Group succeeded on their counterarguments. First, that TTSI satisfied the Sixth Circuit stream-of-commerce-plus requirements. Or, second, that TTSI acted as the alter-ego of the other Trimac defendants. But neither theory establishes jurisdiction on this record.

a. <u>Stream of Commerce</u>

---

legal effects of the record evidence presented by the parties in support of or opposition to personal jurisdiction. *See generally* Hearing Transcript (DN 125). Whether an evidentiary hearing occurred arguably affects the burden of proof within the Sixth Circuit. *See Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1272 (6th Cir. 1998) ("Ordinarily, the plaintiff must prove jurisdiction by a preponderance of the evidence. That standard does not apply in this case, however, because (although there was discovery) there was no evidentiary hearing on the jurisdiction question."). But at least on this record, there's less to this distinction than meets the eye. Counsel largely disputed the implications of the paper record, requested no cross-examination, and discussed evidentiary burdens or presumptions only in the context of the alter-ego analysis, where little or no evidence overcame the presumption of corporate separation. *See generally Conn*, 667 F.3d at 711 (Once "the plaintiff has received all of the discovery it sought with respect to personal jurisdiction and there does not appear to be any real dispute over the facts relating to jurisdiction," the plaintiff's previous prima facie burden "loses some of its significance.") (citing *International Technologies Consultants v. Euroglas S.A.*, 107 F.3d 386, 391 (6th Cir. 1997)).

MCP urged the Court to consider TTSI's "involvement in the stream of commerce" as supporting personal jurisdiction. Hearing Transcript at 24:25–25:4. True, a corporate defendant's "deliver[y] [of] its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State" is *relevant* to the jurisdictional determination. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 298 (1980). But standing alone, that mere awareness or even expectation is not sufficient—at least not within the Sixth Circuit. "[F]or a defendant to purposely avail himself of the privilege of acting within a forum state, he must do more than merely place a product into the stream of commerce." *Parker v. Winwood*, 938 F.3d 833, 840 (6th Cir. 2019). This requires a "'deliberate decision' to pursue" distribution of its product into the forum state as opposed to "merely [being] aware" that the product would end up there. *Id.* at 841 (citation omitted). In other words, the plaintiff must identify some additional step beyond the mere "placement of a product into the stream of commerce." *Asahi Metal Industry Company v. Superior Court*, 480 U.S. 102, 112 (1987) (O'Connor, J.) (plurality op.); *Bridgeport Music*, 327 F.3d at 480 (adopting Justice O'Connor's "stream of commerce 'plus' approach").

TTSI's involvement in the factual narrative alleged by MCP is limited to washing Contrans' tank, at Contrans' request, in an Ontario wash facility, as memorialized in a cleaning certificate. Hearing Transcript at 19:15–21; 25:5–11 (Int'l Group counsel: "this case is about ... the wash certificate"); Xiameter Cleaning Certificate (DN 106-12) at 3; Ethylene Glycol Cleaning Certificate (DN 106-13) at 3. The cleaning, of course, was not a good or product released into the marketplace; it was a service provided in Canada. Nor was the cleaning certificate any sort of product in the marketplace; it was "a physical sheet of paper" posted on the front of the tank that travels with the truck to its eventual destination. *See* Hearing Transcript at 31:24–32:17. The certificate merely "inform[s] the shipper, and anybody else who ha[s] any reason to view the cleaning certificate," what contents the tanker previously contained. *See* MCP Response to Motion to Dismiss (DN 107) at 5 (citing Peacock Deposition (DN 106-3) at 135:21–136:6).

Even assuming TTSI's tank washing amounted to something more than undifferentiated commerce, that still wouldn't show that TTSI deliberately availed itself of Kentucky's courts, laws, or markets. TTSI indisputably never entered into a contract with the International Group, to say nothing of MCP. TTSI's Motion to Dismiss Amended Complaint at 5; Hearing at 32:3–4 (Int'l Group counsel agreeing with Court that the certificate "doesn't say MCP; it says Contrans"). It never "communicat[ed]" with agents of any entity besides Contrans. TTSI's Motion to Dismiss Amended Complaint at 5. It isn't "registered, licensed, or otherwise authorized to do business in Kentucky." *Id.* It never sought to market its services

specifically to Kentucky. *See id.*[4] And nothing about the tank's eventual delivery to Kentucky (as opposed to any other state or country) changed the washing service it performed for Contrans. *See* Hearing Transcript at 33–34. At most, TTSI had some general awareness that the tank it washed in Ontario was headed for Kentucky. *See* Response to Motion to Dismiss (DN 107) at 5. That TTSI was "merely aware" that the tank would reach Kentucky, however, doesn't show that it "made a 'deliberate decision'" to "direc[t]" its tank-washing service towards Kentucky as would be required for personal jurisdiction in this case. *Parker*, 938 F.3d at 841.

MCP and the International Group contend that a "prep list"[5] and the cleaning certificate combine to show that TTSI went beyond mere awareness or "placement into the stream of commerce." *See* Response to Motion to Dismiss at 6. During the hearing, MCP's counsel summarized his "best argument" for purposeful availment: "TTSI knew the end recipient was in Kentucky and created a cleaning certificate that was inaccurate and was relied upon in Kentucky." Hearing Transcript at 28:9–12.

But the mere preparation of a boilerplate cleaning certificate—which TTSI prepares for all cleanings regardless of the eventual destination, see Peacock Deposition at 58—cannot alone prove a "deliberate decision to pursue" Kentucky business or the benefits of the Kentucky laws. *See Parker*, 938 F.3d at 481. Nothing about the Kentucky-specific destination changed the way TTSI prepared the certificate or cleaned the tank. *See* Hearing Transcript at 33:14–22. The certificate itself wasn't addressed to either MCP or the International Group, *see* Cleaning Certificate (DN 106-13) at 3, and TTSI's control ended once it passed the certificate

---

[4] MCP also mentioned "two [TTSI] websites" as evidence of contacts linking that foreign Defendant to Kentucky. *See* Hearing at 23:14. Both websites appear to cover multiple entities, and nothing particularizes their operation or content to TTSI. Indeed, TTSI presented unrefuted testimony that it does not "own, operate or manage" the websites. *See* Peacock Deposition at 32:9–19. Particularly since the Plaintiff bears the burden, *see Conn*, 667 F.3d at 711, it's hardly clear that any "operation of an Internet website" here "constitute[s] … purposeful availment" because "the website is interactive to a degree that reveals specifically intended interaction with residents of the state," *Bridgeport Music*, 327 F.3d at 484. All MCP points to is a single statement, buried in the terms and conditions, indicating that TTSI controls the site. *See* Trimac Website (DN 106-6) at 2; Nationaltankservices Website (DN 106-7) at 2; MCP Response to TTSI at 4. But absent evidence that TTSI actually operated the websites and thereby targeted Kentucky business, and absent any showing that TTSI operates as an alter ego of its American counterparts (as discussed in section (b) below), the websites fail to show that TTSI purposefully availed itself of the Kentucky jurisdiction despite a reference to a Kentucky location unrelated to this case and the sites' accessibility in the Commonwealth.

[5] The "prep list" was a document sent from Contrans to the wash facility. It included a notation that the International Group would drive the truck to "Hickory KY." *See* Prep List (DN 106-11).

to Contrans to distribute as necessary, *see* Hearing Transcript at 32:8–11. That leaves nothing more than mere awareness of the destination to support the theory of purposeful availment. And that falls short under Sixth Circuit law. *See Bridgeport*, 327 F.3d at 480 (adopting *Asahi* plurality approach); *Asahi Metal Industries*, 480 U.S. at 112 (plurality op.) ("a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State"); *Parker*, 938 F.3d at 841 (similar).

b. Alter Ego

MCP and the International Group turned to the law of corporations to advance an alternative "alter-ego theory" of personal jurisdiction. *See Anwar v. Dow Chemical Co.*, 876 F.3d 841, 848 (6th Cir. 2017). But here, too, their contention fails.

An "alter-ego theory provides for personal jurisdiction if the parent company exerts so much control over the subsidiary that the two do not exist as separate entities but are one and the same for purposes of jurisdiction." *Id.* This judicial conflation is an exception to the conventional legal rule that "a parent corporation and a subsidiary are in law separate and distinct entities." *Tennessee Valley Authority v. Exxon Nuclear Co.*, 753 F.2d 493, 497 (6th Cir. 1985). Arguably adding a further degree of novelty, here the Plaintiffs seek to conflate corporate siblings, not parents, arguing that TTSI lives within the same corporate house as the American Trimac entities.[6]

To apply "the alter-ego theory of personal jurisdiction in [a] diversity action," the Court must look to Kentucky law on corporate veil-piercing. *Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008). Kentucky courts "must find two separate elements" in order to pierce a corporate veil: "1) domination of the corporation resulting in a loss of corporate separateness *and* 2) circumstances under which continued recognition of the corporation would sanction fraud or promote injustice." *Pro Tanks Leasing v. Midwest Propane and Refined Fuels, LLC*, 988 F.Supp.2d 772, 783 (W.D. Ky. 2013) (quoting *Inter-Tel Technologies, Inc. v. Linn Station Properties, LLC*, 360 S.W.3d 152, 155 (Ky. 2012)).

The other Trimac entities in this case—TTI and TTSWI—unquestionably do business in Kentucky and have (at least generically) availed themselves of Kentucky

[6] Arguably MCP and the International Group argue instead that *TTSI itself*, not NTS/Trimac Holdings as the parent, dominates TTI and TTSWI in such a way as to disqualify all the subsidiary entities from the protections of their corporate separateness. Although the parties' positions are not crystal clear, the allegations fall short on either theory.

law and commerce. *See* TTSWI Motion to Dismiss (DN 82) at 9 (acknowledging that "TTSWI and TTI do business in Calvert City, Kentucky and in Louisville, Kentucky"). So, on the Plaintiffs' read, because TTSI falls under the same corporate umbrella as other Trimac entities, the same personal-jurisdiction analysis should apply to the whole corporate structure, not just an individual subsidiary. *See* International Group Response (DN 105) at 10 (arguing that Trimac entities "engage in sharing the same employees and corporate officers [as TTSI]; use the same business enterprise; confuse the company addresses; use the same assets; complete the same jobs; and exert control over the daily affairs of another corporation[.]").

Kentucky places a high bar for alleging corporate domination. "The most critical factors" for courts to consider are "grossly inadequate capitalization, egregious failure to observe legal formalities and disregard of distinctions between parent and subsidiary, and a high degree of control by the parent over the subsidiary's operations and decisions, particularly those of a day-to-day nature." *Inter-Tel Technologies*, 360 S.W.3d at 164 (quotation omitted). But these factors aren't exhaustive, and courts "should consider" additional factors expressed elsewhere in the caselaw. *Id.*[7]

None of the critical factors appear here. The allegations regarding the NTS/Trimac corporate structure fail to show any grossly inadequate capitalization, an egregious failure to observe legal formalities, or a high degree of control by any parent over TTSI's operations and decisions. And outside of conclusory allegations echoing the *different* set of (Michigan-law) factors discussed in *Anwar*, *see* International Group Response at 10, neither MCP nor the International Group has shown "that … the alleged paren[t] controls [the subsidiary] to such a degree that [the parent is [its] alter ego" *see Anwar*, 876 F.3d at 848. They simply "fai[l] to make a prima facie case for unity of ownership." *Id.* at 850.

True, all the Trimac entities "use" the same "fleet management system that manages the maintenance records of Trimac's tankwagon fleet, as well as the records related to work performed on the tankwagons of Trimac/NTS's customers, such as

[7] For instance, the Kentucky Supreme Court quoted with approval the Seventh Circuit's list of eleven factors relevant to veil piercing: "(1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere facade for the operation of the dominant stockholders." *Inter-Tel Technologies*, 360 S.W.3d at 163 (quoting *Judson Atkinson Candies, Inc. v. Latini–Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008)).

Contrans." MCP Response at 3–4. The various subsidiaries' "employees in the United States and Canada frequently work together." *Id.* at 4. And the entities utilize similar logos on certain documents, forms, and signage. TTSI Reply to Motion to Dismiss (DN 109) at 8.

But sparse facts such as these do no more than "partially satisfy a few" of the laundry list of factors to consider. *Anwar*, 876 F.3d at 850. The failure to allege a single critical factor here is enough to doom the Plaintiffs' efforts, and no amount of conclusory allegations reciting various factors rooted in Michigan law can change that. The allegations "simply do not amount to a showing" that the Trimac entities lack corporate separation and justify piercing of the veil. *Id.*

The also fall short of showing "circumstances under which continued recognition of the corporation would sanction fraud or promote injustice." *Inter-Tel Technologies*, 360 S.W.3d at 165. The Kentucky courts interpret this prong in the language of traditional tort relief: for example, veil-piercing might be justified where "a party would be unjustly enriched; where a parent corporation that caused a sub's liabilities and its inability to pay for them would escape those liabilities; or an intentional scheme to squirrel assets into a liability-free corporation while heaping liabilities upon an asset-free corporation would be successful." *Id.* at 164 (citation omitted).

Neither TTSI's corporate structure nor its actions as alleged by MCP and the International Group fall within this scope. TTSI is a Canadian business that contracted with a Canadian entity (Contrans) to wash a tank in Ontario, Canada. Amended Complaint ¶¶ 5–7, 21. If TTSI commits a tort in Canada—which it very possibly might've done here based on the pleadings—then they stand subject to liability in Canadian courts. But nothing about their corporate structure appears designed to conceal their identity, insulate them from liability, commandeer a lawsuit to a more favorable forum, or anything of the sort. And without a "specifi[c] … fraud or injustice" to articulate, *Inter-Tel Technologies*, 360 S.W.3d at 165, the Court cannot treat these separate legal entities "as the same party." *Church Joint Venture, L.P. v. Blasingame*, 947 F.3d 925, 930 (6th Cir. 2020).

* * *

The Kentucky courts lack authority to resolve MCP's claims against TTSI. Both MCP and the International Group are pursuing claims against TTSI in ongoing litigation in Ontario, where TTSI is at home and (apparently) subject to jurisdiction under domestic law. Reasons of efficiency and consistency that might favor a single forum in Kentucky, *see* Hearing Transcript at 24:1–9, do not allow the Court to coerce an unwilling defendant not subject to jurisdiction in this forum.

### *2. Personal Jurisdiction Over the American Trimac Defendants (TTI & TTSWI)*

Absent alter-ego treatment, MCP and the International Group's remaining allegations against the American Trimac Defendants fall far short of invoking the Court's personal jurisdiction.[8]

The second prong of the personal-jurisdiction test requires that "the cause of action must arise from the defendant's activities" in the forum state. *Air Products*, 503 F.3d at 550 (internal quotation marks and citation omitted). Even if TTI and TTSWI purposefully availed themselves of the privileges of acting in Kentucky through contacts with Kentucky, the Plaintiff and Third-Party Plaintiff must allege that the various causes of action asserted against the American Trimac Defendants arise from those contacts and activities.[9]

Plainly they do not. The entirety of the American Trimac Defendants' involvement in the case stemmed from TTSI's actions (its washing of the tank certificate issuance). The Amended Complaint and Third-Party Complaint do not identify any specific acts taken by the American Trimac entities related to that tank washing or cleaning certificate. In fact, the allegations never specifically refer to the American Trimac Defendants, referring only to the three Trimac Defendants collectively as "NTS" or "National Tank." *See* Am. Compl. ¶ 10 ("This First Amended Complaint refers to Trimac, Trimac Western, and Trimac Transportation Services collectively as 'NTS.'"); Third-Party Compl. at ¶ 10 (three Trimac Defendants "collectively referred to as 'National Tank'"). And neither MCP nor the International Group identified any evidence indicating otherwise following jurisdictional discovery.

Indeed, the entire basis of liability for these two entities relied on the attribution of TTSI's actions to them as conjoined corporate siblings. International Group candidly acknowledged as much during the hearing: "other than the alter ego-

---

[8] The American Trimacs moved for dismissal only under Rule 12(b)(2) for lack of jurisdiction. *See* TTI/TTSWI's Motion to Dismiss (DN 82). The motion didn't mention Rule 12(b)(6) and the lack of a factually plausible set of allegations that, if proven, could establish their liability based on their own actions—though, at least in hindsight, that omission looks glaring. Because the Complaint and Third-Party Complaint don't attribute any of specific or plausible allegations to the American Trimacs, absent an alter-ego finding those parties would surely be subject to dismissal for failure to state a claim. *See* FED. R. CIV. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level.").

[9] *See* MCP Am. Compl. ¶ 92 (negligence claim "[a]gainst NTS"); International Group Compl. (DN 36) at ¶¶ 13–20 (claims for negligence, breach of contract, breach of implied warranty, indemnity, contribution, and violation of the "Carmack Amendment" against "National Tank").

type statements," there is no "evidence that the two American entities were involved in the cleaning of the tank up in Canada." *See* Hearing Transcript at 12:14–18. Because the "cause of action" did not arise from the American Trimacs' actions, therefore, the Court lacks personal jurisdiction over the American Trimac Defendants with respect to the allegations made in this case. *See Air Products*, 503 F.3d at 550.

**D. Motion to Certify**

Rule 54(b) provides that "[w]hen an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties." The Court must "expressly determin[e] that there is no just reason for delay." FED. R. CIV. P. 54(b). The decision to certify falls within "the sound discretion of [the] district court" and needn't "be granted routinely." *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 10 (1980).

As MCP points out, "[c]ourts *have* routinely entered judgment under Rule 54(b) in multi-defendant cases where some but not all defendants are dismissed for want of personal jurisdiction." Motion to Certify (DN 127) at 2 (emphasis added) (quoting *Bush v. Adams*, 629 F. Supp. 2d 468, 472 (E.D. Pa. 2009)).[10] *See also Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002) (exercising appellate jurisdiction under a Rule 54(b) certification in similar circumstances); *Brunner v. Hampson*, 441 F.3d 457, 459 (6th Cir. 2006) (same). "A [partial] dismissal for lack of … personal jurisdiction … may dispose of a claim completely and thus bring it within the scope of the rule." 10 WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 2656 & n.20 (4th ed.) (collecting examples of certification for dismissals for lack of personal jurisdiction over some but not all parties).

The Sixth Circuit has identified a list of (non-exhaustive) factors to consider in deciding a Rule 54 motion:

> (1) the relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in set-off against the judgment sought to be made final; (5) miscellaneous factors such as delay, economic and solvency

[10] MCP does not ask the Court to certify its order granting without prejudice Contrans's partial motion to dismiss the punitive damages claims on Rule 12(b)(6) grounds. So the Court's analysis under Rule 54(b) applies only to the dismissals for lack of personal jurisdiction. *See* DN 118 (text order summarizing oral rulings at hearing).

> considerations, shortening the time of trial, frivolity of competing claims, expense and the like.

*Lowery v. Fed. Express Corp.*, 426 F.3d 817, 822 (6th Cir. 2005) (quotation marks and citation omitted). Courts use these factors to determine "whether the needs of the parties outweigh the efficiency of having one appeal at the conclusion of the case in its entirety, and it must spell out its reasons for concluding that prompt review is preferable." *Id.* (quotation marks and citation omitted).

In this case, these considerations weigh in favor of certification. *See Schneider v. Hardesty*, No. 1:06-cv-836, 2010 WL 150139, at *3 (S.D. Ohio Jan. 14, 2010) (granting plaintiff's Rule 54(b) motion after dismissing defendant for lack of personal jurisdiction).

First, the relevant questions regarding personal jurisdiction over the Trimac Defendants concern distinct issues of alter ego and purposeful availment. Those are not relevant to adjudication of the remaining claims for breach, negligence, and negligent misrepresentation asserted against the International Group and Contrans. Because "[a]ppellate review of the District Court's order" dismissing for lack of personal jurisdiction, "would not address any of the underlying claims of the parties," certification for review of the jurisdictional question is appropriate. *Id.*

True, the "relationship between the adjudicated and unadjudicated claims" against the dismissed Trimac entities and the remaining Defendants are quite similar in some respects. *See Lowery,* 426 F.3d at 823 ("the greater the overlap in the factual basis between the adjudicated and unadjudicated claims, the greater the possibility that this court will have to revisit the same facts under a different theory in a second appeal"). But the Court's decision dismissing the Trimac entities is not based on a review of those parallel claims, but instead on the Court's lack of jurisdiction *to* review them with respect to the dismissed Defendants.

Second, and for similar reasons, no future district-court developments are likely to moot the need for review. Absent reconsideration, it's hard to imagine what would bring these parties back into the case or lead the parties to a global resolution.

Third, nothing suggests that certification could cause the Court of Appeals to "consider the same issue a second time." *Lowery,* 426 F.3d at 822. None of the issues pertinent to the remaining claims against the remaining Defendants appear to bear any relationship to the questions of purposeful availment and alter ego addressed above.

Fourth, no counterclaim or set-off is apparent at this time. But a related issue—apportionment of fault against the dismissed Trimac Defendants—could

further complicate the litigation absent resolution of the jurisdictional questions. *See generally* K.R.S. § 411.182(1) ("In all tort actions," the court "shall instruct the jury" to make findings determining "[t]he percentage of the total fault of all the parties …"); *Mem'l Sports Complex, LLC v. McCormick*, 499 S.W.3d 700, 708 (Ky. Ct. App. 2016) (Maze, J., concurring) ("KRS 411.182 requires apportionment among all potentially liable parties, including those who have been dismissed or are not before the court").

Fifth, failing to certify the Court's decision could lead to duplicate litigation in this Court—including the possibility of two (potentially inconsistent) trials regarding closely related facts and claims. *See Schneider*, 2010 WL 150139, at *3 ("immediate appeal … would avoid the possibility of a second trial on the same issues and operative facts governing the claims still pending against the remaining defendants"); *see also Hinkle v. Cont'l Motors, Inc.*, No. 8:16-cv-2966, 2018 WL 10096593, at *2 (M.D. Fla. Jan. 8, 2018) ("resolving jurisdictional issues at the outset of litigation … may obviate the need for a second trial") (internal quotation marks and citation omitted).

No remaining considerations weigh heavily against certification. While an immediate appeal might conceivably delay resolution of *this* case, outweighing that concern are the countervailing considerations mentioned above regarding duplicate trials, potentially inconsistent verdicts, and complicated apportionment issues—which themselves could potentially cause even further delay. And while this litigation is certainly not in its earliest stages, neither is the case nearing trial. Discovery is ongoing and the dispositive-motions deadline does not arrive until April 2027. *See* Amended Scheduling Order (DN 140). Further, there's no reason at this stage of litigation to believe that future developments will moot the need for review. Even if a jury were to find the remaining Defendants not liable, a jury could still apportion fault to the (absent) Trimac Defendants.

Because the "needs of the parties" in certifying the Court's dismissal of the Trimac Defendants "outweigh the efficiency of having one appeal at the conclusion of the case in its entirety," *Lowery*, 426 F.3d at 822, the Court certifies its interlocutory ruling as final with respect to the three Trimac Defendants (TTSI, TTI, and TTSWI) under Rule 54.

**ORDER**

As discussed above and during the hearing, the Court lacks personal jurisdiction over TTSI, TTI, and TTSWI. So it granted those motions to dismiss. *See* DNs 72, 74 & 82. The Court grants MCP's motion (DN 127) to certify that ruling under Rule 54(b). A separate order to that effect will follow. *See* FED. R. CIV. P. 58(a).






September 30, 2026